Good morning, Your Honors, and may it please the Court. My name is Angelo Calfo, and I represent the appellants, the plaintiffs below in this case. Your Honors, it was in June of 2020 that the City of Seattle ceded control of a portion of the Capitol Hill neighborhood. Police officers were not allowed to go into that portion of the neighborhood. It was about a 12-block portion of the neighborhood, and it was referred to as the CHOP Zone. Police were not permitted to go in there except in very unusual circumstances. Firefighters had the same kinds of restrictions, even as fires were burning in Cal Anderson Park. And essentially the public safety function of government was removed from this area. After the City essentially created this zone, because it was cordoned off by the barriers that it provided on multiple occasions, the City took several actions that fueled a dangerous and lawful environment that had a serious and devastating impact on the plaintiffs. That's why they filed the... Can economic harm be the type of serious and dangerous harm? I mean, I don't, I can't find a case in our circuit that talks about serious harm as being merely economic harm. Yes, Your Honor. I think the first starting point from my perspective is that corporations do have due process rights, so regardless of what harm follows... That's not really my question. My question is whether or not mere economic harm can rise to the level of the type of serious harm that we've talked about in some of our other cases. The answer is yes, Your Honor. There is one case that did find that, and it was, interestingly, the City cited an earlier case that was provided by this District Court. It was LLC Railroad in the Sacramento, I think it was in Federal Court in Sacramento, and I can find a site for Your Honor. Do you have any appellate authority that state-created danger can apply solely to economic harm? I have no appellate authority on that, Your Honor. There is none in the Ninth Circuit. There is one District Court opinion that did find that economic harm qualifies. And did you find any outside of the Ninth Circuit? I did not, Your Honor. No. So you are basically asking us to decide for the first time that economic harm alone could trigger a state-created danger, correct? I guess I am in a sense, Your Honor, but on the other hand, it does follow from the fact that corporations do have due process rights, and then the question becomes, why would we distinguish between citizens and businesses? Citizens can be harmed violently. Corporations can't. But what we had here was very serious harm, which was the potential to... And I think that there is a scenario in which a business, a corporation, and I think there is a difference between saying that the corporation could never bring this claim. My question, and if I understand Judge McHugh's question, it is not one about whether you can bring this claim in the first instance. It is not a standing question. It is whether or not under what you have to prove as an element of your claim, it rises to the level of seriousness. So there could be a scenario in which a business suffers serious physical harm, such as damage to its property, or something that is more than sort of the loss of business, sort of the economic harm that I think you are alleging in this case. Yes, Your Honor. So I guess I am wondering, what would be the policy reason why we would want to disregard government action that causes serious harm to a business as opposed to an individual? It seems to me that we should be protecting both businesses and individuals. Let me talk a little bit about what the policy reasons are behind this doctrine in the first place, because sort of the state-created danger doctrine, as I understand it, and from remembering my days in law school, which was a long time ago admittedly, sort of these cases arose under this notion of physical danger that is presented to, say, a child who, you know, falls into a ditch and is severely injured, or somebody who is shot. So maybe you can talk about the public policy behind why we would extend the doctrine to a merely economic case. I think because we should protect businesses who are subjected to being placed in a more dangerous position than others. So did the city actually place them in a more, affirmatively place them in a more dangerous situation? Affirmatively. What did the city do affirmatively? As opposed to omissions. Well, Your Honor, I think there is a wide variety of affirmative actions, and I'll start with providing barriers. They not only left behind the barriers that were, you know, when they abandoned the police precinct, but then several days later they provided bigger concrete barriers that had plywood sheaths on them so that the chopped protesters could put graffiti on them. And was that for all the businesses? Was that damage to your client that they had graffiti on barriers? Well, Your Honor, it created a lawless environment that encouraged vandalism. Our client's tables outside the restaurant were turned over. The windows were broken. There were threats to the residents of the Hugo properties. They blocked access to the parking lot. They blocked access to the streets. Did they put these barriers around the park? Or just in front of your clients? Well, Your Honor, that I think goes to whether there were particularized danger to them. And I think, and I'm sort of jumping around here, and I think a lot of these concepts involve the same facts. But let's talk about that. It seems to us that you could look at the particularized danger issue on a number of different levels. One level would be that what the city did was targeted to the folks who lived in the 1111 East Olive Building, including Omabop. The city placed dumpsters right outside their door, enlarged dumpsters that blocked the street that went into their property, blocked their parking garage. They were adjacent to the Cal Anderson Park, where the city encouraged a massive tent encampment. Well, I mean, you're kind of mixing and matching theories here. So I'll go to the dumpsters, I guess, or the toilets. I mean, was there deliberate indifference vis-a-vis your client? Or was this a reasoned decision that we have a situation up here in the CHOP Zone, and we've got to have some trash and toilet options? I mean, where is the deliberate indifference in that? Well, Your Honor, I think the deliberate indifference is that when the city officials went onto the property, they knew that there were businesses and individuals in the apartment building on 11th and Olive. And they said, well, we're going to create an epicenter of this occupation on 11th and Olive. We're going to put large dumpsters down. We're going to put sanitary services there. I understand all that, but obviously there were public safety concerns, and there was public health concerns as a result of this gathering or conflagration up at the Cal Anderson Park. But when the city decides they have to go somewhere, you're not saying that the city should have just disregarded the health concerns, right? Your Honor, I think this is a theory that is not in our complaint, that they were doing this for some other reasons. And I'll note that when the government... Well, we have to show some deliberate indifference. I mean, if they put it next door, then you'd say, well, maybe those people can complain, but we can't complain. Well, Your Honor, how about the fact that the mayor went to the Hugo Properties Manager, and the Hugo Properties Manager said, this is what's happening to my property, okay? I can't get into the parking garage. Our residents are being threatened. People are walking around with guns because no police officers are around. Isn't that indifferent? Well, there are so many potential theories here. Let me go to that police theory. So in a way, you're saying that there's an abdication of policing. I read that not directly. I don't actually say that, Your Honor. I think what I'm saying is there was a decision made to remove public safety from that particular area, which different... Okay, abdication may be too harsh of a word, but they made a decision to go from a more aggressive policing to a more passive one, to a degree. That's not our theory in the complaint, Your Honor. No? What's your theory? The theory in the complaint is they made an affirmative decision to remove all public safety function, except in the most egregious circumstances, like a mass casualty. We're not going to go in. So I read in your complaint, in ER 50 to 52, your allegation is that the city knew about the danger, kept its own employees out of chop for their own safety, and ignored plaintiffs' pleas for help. Yes, Your Honor. They did all that and everything else we put in the complaint. Right. Yes. So, you know, there's a couple cases come to mind. One, Supreme Court in Deshaney talks about, you know, you have kind of a non-policing policy here, if we're going to do what you say in your complaint. But this sort of guarantee of minimal security and safety was rejected in Deshaney. What is your response to that? In Deshaney, what the court said is the state did nothing to create the danger. Right. We have an opposite situation here. There's no affirmative right to governmental aid. Right. And there's not. There's not. So you're then saying, oh, but there's no right, but then they added these barriers and toilets and things. And that then created a danger? Well, Your Honor, again, I think it's... You're mixing and matching the state-created danger with your problem of I can't get in because I put these dumpsters and toilets nearby my front door. I mean... Well, I think maybe... I don't know quite... You know, Your Honor, I think we are jumping around from different theories. Right. These facts all relate to deliberate indifference, state-created danger, and particularized danger. Well, but I think we have to analyze each of those claims separately. So we've established that no one has ever, at least no circuit court nationwide, has ever said economic damage alone would give you a state-created danger. But if you didn't have the state-created danger theory, you have other theories. Right? Yes. Well, I do have the nuisance theory, yes, Your Honor. And we do have the takings theory. And I, you know, I have not... I did not... Well, on the nuisance theory, Your Honor, I'm going to argue an en banc decision of this court that found that the statute in question, nuisance, was a three-year statute. I don't know what more strong... But the state courts seem to have a different view. Right. Well, I don't know that they did, Your Honor, because the only case that they're arguing is this Lewis v. County... I think it was County of Lewis, County of Lewis case. And I read that case this morning, and it's a negligence-based theory. And the other cases that they cite are all negligence-based theory. Anytime where the facts relate to an intentional nuisance, the statute... the courts provide... call for a three-year statute. That's... But also, in my view, the equitable tolling, the American pipe tolling, I think, also is a good argument. And I read CAMPO as convincing evidence that the court would adopt American pipe tolling. I agree, Your Honor. I mean, the reasoning behind CAMPO applies 100% to the American pipe. So is there a reason why we should decide it one way or the other? I mean, maybe tell us what your preference is if we were to decide this issue, with the result being that... That's a hard one, Your Honor. I win either way. But what about certifying to the Washington Supreme Court? We could do that. But, Your Honor, again, I don't know why we need to do that because Skykomish already decided the issue, and it was an en banc decision. But, yes, the other option, which I'd be happy to accept, would be to have the Supreme Court... What's the theory of your nuisance claim? The theory of the nuisance claim is everything that we've said the state did that created the danger that we think is a substantive... Yes. Or a private nuisance. Well, Your Honor, that wasn't actually something that was dealt with below, but I think it could be characterized as either. Yes, it is. I think it was a private nuisance in the sense that they targeted that particular building by creating the dangers around it and resulting in vandalism. What they did was for the whole area, correct? I mean, they didn't just put potty toilets or whatever in front of your client's business. They put them throughout the park. Well, that's true, Your Honor, but they put... And they put those concrete border rails throughout the park. Well, again, I think we're bouncing around, but... No, no, no, I'm talking about... But here's the thing. You said it could be a private nuisance. Counsel, I'm going to put some time on your clock so that you can actually get your full sentence out, and we can give you enough time for rebuttal. Yes, Your Honor. Thank you. Go ahead and try to answer Judge Paius's question. Your Honor, when it comes to whether it's a private or public nuisance, I think it was both I think is probably the best answer because it was private in the sense it was directed toward that building. It was public in the sense that the city blocked off that 12-block area. One... I'm sorry, Your Honor. No, I was just going to say, well, if it was directed at that building, how did this nuisance, whether it's private or public, damage the building? It damaged the... It was a nuisance in the sense that it blocked the residents' access to the building. It created a threatening environment, a lawless environment, in which the residents were scared and needed to leave or shorten their lease. For Oma Bop, the deliveries couldn't come into the building. I mean, they basically had to close. Windows were broken. Customers were threatened. I mean, it's a pretty serious... We understand the gravity of the situation up there. But, you know, let's just... Why is it such... I don't believe that it's fair to say that where the city has cordoned off a 12-block area and did all the things that we've alleged in the First Amendment complaint, that that is not a discrete and identifiable group of people that were subjected to the wrongful conduct of the city. Thousands of people in the Hernandez v. City of San Jose case were shuffled into a group of protesters that hurt 20 of them. In this case, essentially what the city did is endorse, authorize, support, help thousands of protesters and shove them at Cal Anderson Park right to our clients. So it's the same concept. Okay, counsel, we're going to hear from your friend on the other side, but I'll put four minutes on the clock for rebuttal. Yes, Your Honor. Thank you. Thank you. Good morning. Excuse me. Good morning, Your Honors. Shane, may it please the Court. Shane Kramer, Brian K. Blayden Kaysner on behalf of the City of Seattle. I'd like to address the issues that you spoke to my colleague about in order. First, the Court's correct that no one has identified any state-created danger case that recognizes purely economic harms. And I think that you can trace that back to the entire purpose behind the state-created danger doctrine, as Your Honors recognized. It starts with DeShaney recognizing that the liberty interest that is at issue in this narrow, narrow exception from substantive due process is, quote, the freedom from unjustified intrusions into personal security, a personal liberty interest. In Wood, the First Ninth Circuit case, to adopt it here, again, recognizing the deliberate indifference to a passenger's, quote, interest in personal security. Kennedy, too, individual's liberty interest in personal security. Patel changes it slightly. Patel recognizes that it's the due process right to bodily integrity. And in Palook, another Ninth Circuit case, recognizing that it's the person's interest in personal security and bodily integrity, liberty rights that belong to individuals. Plaintiffs have not, or appellants have not, cited any authority that would call for the expansion of that. And, in fact, their substantive due process claims that they did cite it, including specifically the San Bernardino case, makes clear that individuals can have different substantive due process rights than corporations who would broadly have the same type of rights. But some only apply to individuals, not corporations. And that's the same thing. Do we need to decide that issue in order to adopt your position? No. What's your best case that you can cite us to for the proposition that there should be a distinction made between the due process rights that corporations enjoy versus the rights of individuals for purposes of this doctrine? I think it's any of these, and I don't know if that's an acceptable answer. But in DeShaney, I mean, DeShaney makes clear that it is carving out something very precise. And even in the 1900 railroad case, the court says, okay, we'll accept this, but then goes on to say you don't have a state-created danger case because what was at issue there was clearing out a homeless encampment, and the state-created dangers that were alleged were giving them trash receptacles, giving them water, giving them supplies, the same exact type of things that are being alleged here to create a state-created danger. And I think the conclusion of that, Your Honor, is with Polanco. Polanco recognizing that this string of Ninth Circuit cases implicitly require a bodily, a harm to bodily integrity, personal security that rises to a very severe level, one that property damage, lost profits just don't meet. In terms of the nuisance, where I'd like to turn next because you're—oh, go ahead, Your Honor— because Your Honors were interested in that. What do you make—before you turn to the next issue, what do you make of the dicta in Sinclair that indicates that Capitol Hill business owners were appreciably closer to meeting the particularly standard that our precedent requires? I think the most important part of that dicta is that they make no holding with respect to Hunter's Capital, that they are not taking a position one way or the other as to whether or not Judge Zille got it right in that case. And in light of Sinclair, there are a couple of statements in Sinclair that are really important and that we really think are determinative here. One of them is the statement at page 684 in describing the types of dangers, the generalized dangers that CHOP presented. The court says, quote, the alleged dangers in CHOP were of unchecked lawlessness and rampant crime affecting everyone. There's nothing unique to the types of harms that were alleged in the complaint here that didn't affect the public generally. Yeah, but I think what this language is really talking about is sort of the particularized issue, not so much the issue about whether or not business owners would be able to— I read that dicta to imply that perhaps that panel of the court, had they been presented with an issue of a business owner, might have actually found that there— but for the particularized nature of the harm, they could bring economic harm claims under this doctrine. But the harms that were alleged in Sinclair are the same harms that are alleged here. They are harms that affected, allegedly, businesses, visitors, workers, employees— Without particularity. Without any particularity whatsoever. Anybody who came in contact with CHOP was exposed to danger. That's the bottom line of the complaint here and the complaint in Sinclair. The other piece, though, that the initial Hunter's Capital court didn't have in front of it, because Sinclair clarified this, is that unlike the traditional Ninth Circuit state-created danger cases, CHOP was, quote, neither specific nor immediate nor of limited range or duration. It's not the type of harm that you endanger that your typical state-created danger cases in this circuit have recognized. And here, Judge Zille was, again, correct, because the duration that plaintiffs are alleging is even broader than in Sinclair. They not only say that for the three weeks that CHOP existed, we were harmed. They say, actually, you cleared CHOP, an encampment started, and so our harms lasted all the way through December of 2020. So it's even broader and more amorphous than the Ninth Circuit was presented with in Sinclair. And so that would be another way to distinguish that dicta. In terms of the nuisance issue, with all due respect, the panel on Bonk got it wrong on Skokomish. It was not a well-reasoned dicta. It was- Well, it didn't relate to anything in the case, right? Right. So then we go and we take a look at the Washington Court of Appeal cases, and I think there's three or four of those. We've got two out of Division II, Lange and Wallace, one out of Division I, Mayer, and then there's Burlington Northern. So how do you square all those? So all of those, they all go back and say, even in Bradley. I mean, it's an older decision, but it's a Supreme Court decision, and all of the courts that have interpreted it, including several of the district court cases that we cite to, they rely on Bradley to say, Bradley maintains a two-year statute of limitations for nuisance. And the notion that there's a difference between intentional nuisance and negligent nuisance, that is not a distinction that is recognized in the case law. My colleague cites two cases that are asserting a separate claim for negligence to real property, and Wallace deals with this specifically and says, you know, that's it. Why can't we look at CAMPO as convincing evidence that the court would adopt American pipe tolling? I think there are lots of reasons. One is, as Judge Ginelli correctly noted, the Supreme Court did explicitly decline to adopt it. Well, it didn't say that. Okay, that it didn't apply. It couldn't have applied. There's no need for us. No need to address that. Because it's an associational standing case. And then it went on to equitably toll the statute of limitations for reasons consistent with American pipe. It went on to develop its own test. That looks just like American pipe tolling. With all due respect, it doesn't at all. And that was going to be my next point. The court very easily could have said, we're going to adopt American pipe style tolling for associational standing cases, which would have meant that for the entire period of time that the associational standing case was going on, statute of limitations doesn't run for that entire period of time. Because that's what American pipe is. American pipe is, you just don't count the time until between. It's toll. It's just toll. It's toll for that entire period. But the Washington Supreme Court didn't want to do that. Because there are several Washington State Supreme Court cases that say, Washington's tolling rules are stricter than federal tolling rules. That's the Fowler case and the In re Fowler case, which are two different Fowlers. And so that's why in Campo, or it's one of the reasons, or it's indicated why in Campo they don't just do that. Instead, they latch it onto and create a very precise, nuanced, and narrow tolling exception for the circumstances only in Campo. My difficulty is that if we go back and look at the court of appeals decision in Campo that adopts Fowler and then the Supreme Court rejects that and applies equitable tolling, how can we say that the court of appeals decision is what we ought to be looking at for purposes of knowing that tolling doesn't apply? Because, I mean, I think Judge Gilley's point was well-reasoned that it didn't reverse. And it is the only court of intermediate level that weighs in on this at all. And if you say that we're— Even if its decision is undermined by the Supreme Court's decision? I mean, that's the question, isn't it? We have the court of appeal flat out where they declined to apply American pipe. Now we come up to the Washington Supreme Court, and it doesn't apply American pipe. And then the question is, well, why not? But what does it do? That's what we're left with, right? And it does something different. And I take this from a different angle, which is the Ninth Circuit's precedent on these tolling doctrines, and I point you to the Clemens case, and I have a pin site someplace. It's dealing with cross-jurisdictional tolling, another equitable tolling doctrine. And they say, for statutes of limitation, those are important issues of state policy. We're not going to predict what a state would do. So that just counsels that we ought to certify it to the Washington Supreme Court. I think that the question that you would certify would be a complicated one. I actually think that it counsels in favor of affirmance. You could write a pretty easy question. You could, but I'm going to complicate it. Can we let him answer the why? Yeah. Why you think it would be complicated to certify because of the nature of the question. And this was an issue that was not raised in the appellant's opening brief. We addressed it in our response. They touched on it in reply. Cross-jurisdictional tolling. So you actually have three levels of tolling here. You have American pipe, which is federal claims, federal court. You have what they're asking to be done, which is for the Washington state court to adopt an American pipe style tolling for state class actions in state court. That is the only thing that would have been even addressed at all in CAMPO. It was a state law claim in state court. What we have here is would Washington state accept tolling in a federal case, in a federal class action, and that is called cross-jurisdictional tolling. That's not cross-jurisdictional tolling. According to Clemens, it is. Well, here we have in the federal court we have a prior class action that was not certified. The absent class members come over and they file another case, and that's what we have here. So we have two federal class actions in play. Our second one is not a class action. Just simply to ask, what would the Washington Supreme Court do with respect to tolling? That is the precise question in Clemens, and there are three district court cases that I would point you to because they explain this far better than I just did. The Centaur convertible case that we cited, the Ford case that we cited, and the Martin case. The cross-jurisdictional element is applying state law statute limitations to class actions in federal court that were dismissed and what you do with the follow-on case. And all of those cases go through the detailed, lengthy policy reasons why you don't adopt cross-jurisdictional tolling. My understanding is that our general rule is that if the Washington Supreme Court has not decided the issue or clearly indicated what it would do if the issue were before it, we can look to the Intermediate Court of Appeal decisions. Okay, fine. Here, the one that really seems to apply is Campo by the State Court of Appeal. You look at that and you look at their reasoning on this where they say, you know, American pipe doesn't apply because this was a representative action, and then they go on and say, well, even if it did apply, the key difference is, the key thing is that under traditional tolling in Washington law, there has to be bad faith by the defendants. Right? That's key to tolling, equitable tolling in Washington. It's one of the criteria. Okay, so then it goes, that case, Campo goes to the Washington Supreme Court, and they say, okay, we don't have to decide equitable tolling, but what they do adopt is this unique tolling situation for this representational action, and it looked like they really wanted to give these plaintiffs a chance to pursue their claims, which they won on in the state trial court. But they don't adopt American pipe. But they came up with this unique tolling situation or rule to deal with that case, and the reasons that they give are the same reasons that the U.S. Supreme Court gave for adopting American pipe tolling, and the other thing is they point that what's significant is there's no need for bad faith. Can I take a couple of seconds to respond?  Bad faith does remain a very important element of equitable tolling in Washington. But what you also had in Campo and what was extremely present and the court went out of its way to note it was diligence. Before the Supreme Court had even issued its mandate from the case getting rid of associational standing, the plaintiffs had already filed their class action. Here, the plaintiffs have known about this case. They're represented by the same counsel. They had the entire loss, the Hunter's capital lawsuit to join. They could have intervened. They didn't. They sat for 11 months after the parties settled that lawsuit and then finally too late brought this claim after the statute of limitations had to hold. And so there's no diligence, and that is certainly a factor in any test that the Washington Supreme Court would adopt. Thank you, Aaron. Thank you for taking over your time. I appreciate your argument. Your Honors, I wanted to start with the Campo decision. The policy considerations that led the Supreme Court to find, the Washington Supreme Court to find that tolling existed in that case, which wasn't a class action, applied to class actions. And I think when you read the Campo decision, the policy issues just translate identically. You know, we're left with they didn't apply. They had the opportunity to apply American Pipe. The Court of Appeal explicitly declined to do that, and they didn't do it here. So what you're asking us really to say is, but we should apply American Pipe, right? And I'm kind of hard-pressed to figure out how to do that in light of the wording of the Washington Supreme Court. Yes, Your Honor. The reason when I read the Campo decision, what I hear them say is that this isn't a class action, so we don't need to decide American Pipe. It's the wrong kind of case. And the reasoning that they provide are consistent with American Pipe but not American Pipe because it's not a class action. They say it's to advance the goals of adjudicative efficiency and justice and to avoid individual filings that would burden our courts with the multiplicity of litigation, which was the reasoning underpinning American Pipe. Exactly, and that's what the plaintiffs did in this case. They reasonably relied on the pending class action, waited for resolution of it. I don't believe it was 11 months. I think that's an overstatement. How long was it? I think it was a few months that we filed. But you can imagine that there would be things to address as a new plaintiff after the city settled the Hunter's Capital case. I can just theorize. For example, settlement discussions could have occurred, or they needed to regroup after Hunter's Capital and decide whether they needed to go forward. This is all speculation, so here's the question. Were we to decide that there is an option for equitable tolling, would that go back to the district court to have all this come out and look at diligence and all those issues? How can we decide that on appeal? Well, I think you don't need to do that. You don't need to remand it if you decide that American Pipe applies. I think at that point you have everything you need to make that decision. You're well within the statute of limitations if it's tolling. Yes, Your Honor. If it's tolling, yeah. Yes, Your Honor. Either way. So I would only just additionally point out that when you look at the state court rulings on whether nuisance is two or three statutes, there is a clear distinction between the cases. In cases where the nuisance is characterized as negligence, the court finds a two-year statute. In cases where the facts indicate that it's an intentional nuisance, the court applies a three-year statute. If you couple that with the Skokomish finding, and of course when Skokomish was remanded, Judge Rothstein did apply the three-year statute as directed by the appellate court. So I think you've got what you need there to just decide the case, but another option is obviously to use the American Pipe case, which I think when I read the Campo case, it's quite clear that the Washington Supreme Court would apply American Pipe in a class action case for the same reasons it applied it in the associational representative case that it did in Campo. Your Honors, I wanted to spend a minute on Sinclair. In Sinclair, I think the decision about whether or not there was a discrete and identifiable group in Sinclair, the court actually addressed this quite clearly. It said, with respect to visitors that voluntarily came into the zone, we're not going to find that they were a discrete and identifiable group that was subject to particular danger because they came to the location. Very clearly what Sinclair said is with respect to the businesses and individuals who reside there, it's a different story. And the court found this strong evidence, very persuasive evidence, that there was a discrete and identifiable group that was subject to a particular harm. I mean, it's as clear as day in the opinion. They also found deliberate indifference on that scale. And my argument is actually different because I think in the first amendment complaint, we actually say there are subgroups of identifiable groups that were subject to harm. The plaintiffs themselves who had individual contact with the city, where they told the city, this is what you're doing, and the city just ignored them, essentially. They continued to do what they were doing. We have the residents of the intersection of 11th and Olive, which is an even smaller subgroup and more directly targeted because of the adjacent Cal Anderson Park and the epicenter of the hub at 11th and Olive. But Sinclair says it can be broadened even to the entire CHOP location, which is not that many people when you compare it to the city of San Jose and Hernandez case, or even Polanco. A number of people were potentially impacted by the decision to transfer those prisoners in Polanco. So I think the point I want to make is, while traditionally the issue has been directed toward a particular person, Hernandez shows it can be a larger group. Polanco shows it can be a larger group. And I think that's important to the decision here. Counsel, you're over time, so maybe take a moment to conclude, please. Well, Your Honors, my conclusion is that what I'd like to conclude by saying is I think that in this particular case, the substantive due process argument, the civil rights case should be, you know, the judge's decision below should be reversed because when businesses are subject to this type of serious harm by a danger created by the state that's directed toward a particular group of people, they ought to get relief. And I know that no other court has found that, but there is a decision that we cite in our brief, which is called RK Ventures v. City of Sacramento, where a district court did find that economic harm qualified. And I think the policy considerations to protect people, including businesses whose constitutional rights are violated, ought to be vindicated in the case. Thank you, Your Honors. Thank you, counsel, for your argument in that case. The matter is now submitted, and we'll hear the last case set for argument this morning.
judges: McKEOWN, PAEZ, DESAI